Good morning, Your Honors. My name is Mary Walter Meyer. I represent the petitioner in this case, Mr. Vanak Chhoeung. This case is about persecution of others, and in particular whether Mr. Chhoeung, whether there is... You may be seated, Mr. Chhoeung. Thank you. substantial evidence that Mr. Chhoeung persecuted others, and whether the immigration judge's decision is correct. In this case, the judge granted deferral of removal under the Convention Against Torture, concluding that Mr. Chhoeung did face torture should he be forced to return to Cambodia. But because of the conclusion that he had persecuted others, he was denied withholding of removal under the Convention Against Torture. Now, what's the consequences of a judgment of deferral of removal rather than asylum? Does that mean that Mr. Chhoeung cannot be deported to Cambodia, but he may be deportable to other countries? That's part of it, Your Honor. It's a very precarious status. It does not lead to your ability to apply for permanent residency or U.S. citizenship. It means he can't bring his family here as well. And at any time there are streamlined procedures for the government to go into immigration court and say, well, we think it's different. You need to prove now that you still fear torture. So it's precarious. Do you know whether the government routinely looks for other countries that will accept people who are in this status? I don't know. I doubt it, because there would be very few countries that would take someone. So then he can stay here for some time. Correct. But the real problem is that he can't bring his family here. And he has no security. It's possible the government could decide tomorrow that they wanted to institute proceedings again. And there are streamlined procedures. He bears the full burden of proof all over again. But yes, separation from his family, the inability to help them, he hasn't seen them in almost seven years. That's a very key factor. Persecution must be on account of a protected characteristic, race, religion, nationality, membership in a particular social group or political opinion. The government has conceded that as far as the K-5 program goes, that there is no evidence in the record that Mr. Chung persecuted anyone by his involvement in that program. There are two discrete issues here that the immigration judge conflated and intertwined in his conclusions. One is the K-5 program, where people were sent to work at the border. The second is whether Mr. Chung referred people to his superiors on account of a protected characteristic, and those people were persecuted on account of a protected characteristic. With the K-5 program, there's nothing in that record. This was a mandatory government program. It was misguided. People died. But Mr. Chung's involvement in that program did not constitute persecution of others. Everyone in the country was required to participate. Mr. Chung was required to participate. There was nothing about dissidents being sent to the border. It was everyone. As far as the referral to superiors, there is not substantial evidence in this record that Mr. Chung referred someone to his superiors because of some kind of political opinion, or that anyone that he did refer was persecuted because of some kind of a political opinion. The immigration judge confused as well. There were two chains of command here. One, political matters. The country still was in somewhat of a state of civil war with the Khmer Rouge committing terrorist acts and raids from the border. Political matters, Mr. Chung consistently testified several different places. Those were not his jurisdiction. The police handled these. He was not involved in these. He was not allowed to be involved in these. It went directly through the chain of command of the police, up through the Ministry of the Interior. There was one individual who was caught with a grenade. Mr. Chung specifically testified he had nothing to do with it until after this man had been arrested, and then he performed an investigation. He heard rumors later that this man was tortured, and under the circumstances it would be logical to assume he was. He had no involvement. He had some responsibilities as being the village leader or whatever the nomenclature should be. What exactly were his responsibilities? What was he to do in terms of reporting people to higher authorities? This is the lawbreaker category. At this point in time, soon after the Khmer Rouge were ousted, there was no judicial system in the country. They relied on these neighborhood leaders to help teach people the right way, to try and maintain order. If someone refused to participate in public works programs, street cleaning, he was responsible for trying to educate them to say, look, you have to do your fair share, and people didn't want to do it. He would talk to them up to three times. If they still didn't cooperate, those people he would then refer on to his superiors. Was he obliged to do that as part of his responsibilities, or was it totally discretionary on his part? From the testimony, it was one of his responsibilities. It was one of his responsibilities to make sure that people reported visitors to the police, overnight visitors, again, because of the security situation in the country. He testified that it was one of his responsibilities, there was domestic violence, husband beating a wife or children, that he would try and talk to that person. If it didn't work, then that person had to be referred on to his superiors. But there is no testimony that he ever referred anyone for any political reason. Counsel, what do we do with the testimony on pages 179 and 180? Question, did the asylum officer ask you if any of those dissidents whom you sent on to your superiors were subsequently killed? Yes, they have politics against the government. The most logical interpretation of that question is that were people killed who had politics against the government? That would be his understanding of that question, and he said yes. But he testifies then more extensively. We have a follow-on question on page 180 and subsequently where they ask about the people that were killed. He said that my job was to educate them so that they didn't oppose the government. If my reeducation efforts were not successful, then I referred them to my superiors, and if they don't agree, they will be killed. I'm looking at line 7, 7 and 8 on page 180. If they don't agree, if they agree, they will not be killed. He said that political opponents, again, people that he did not have political affiliation with, he referred them to his superiors. He said if they agree, they will not be killed. The government does a follow-up question there, and if they did not, they were killed? He says no. He clarifies it right there. Well, what happened if they did not agree is the next question. First, because I'm the village leader, I have to educate them to make them understand. So what he's saying is if they don't agree with the government, my first job is to try and educate them so that they will agree with the government. If I'm unsuccessful, the way I read this, he says, if I'm unsuccessful, then I refer them to my superiors. And there is the possibility, when I refer them to my superiors, that they will be killed. He doesn't say that at that point. He says, yes, for continuing reeducation. The government asks, what if that reeducation did not work? Yes, then there's the problem. They get punished. Since we're talking about reeducation here, we're not talking about criminal acts, except for the criminal act of opposing the government. These aren't people holding hand grenades. That was a different incident. These are people that he's talking about reeducation. Correct. And when you look at his other testimony, who were these people? Domestic violence. Refusal to perform. Well, the whole predicate for this is the discussion that starts on page 179. Yes, this is his answer. They have politics against the government. Those are his words, not the government's words. And again, the translation of this hearing was confusing and complicated, to say the least. If you look at this in context, he's answering the last part of that question. Were people killed? And he said, yes, if they have politics against the government. That would seem like a pretty direct answer, wouldn't it? I understand there's some difficulties here with translation. Everything walks in straight lines here. But that does seem to be a pretty straight answer. And the question I guess I have for you is, that looks like a pretty straightforward answer. What is the I.J. supposed to do here? I gather that you were not, were you trial counsel here? Yes, I was. You were counsel here. Okay. Did we make any effort to try and correct the record? Did you make objections to the form of the translator, to the translator at the time? I don't understand Cambodian. And it was frustrating the whole way through. Did you have reason to believe that the translator was not competent? There were three different translators at three different hearings. One of them, the second hearing, was clearly incompetent. The judge had a lot of work to do. And the attorney and I all agreed this is just a disaster. Yeah. And he just cut the hearing short. With this, what I did is I went back on redirect to try and clarify these things. The rules of evidence in immigration court are relaxed. You can't object in quite the same manner as you can in a regular court. And I could see that there were misunderstandings. I focused my redirect on that to try and clarify what had happened. Another problem is between direct exam and cross-exam. So is it your position that these answers have not been translated correctly? And then what evidence do we have? Whether they were not translated correctly to him, whether he didn't understand or whether the translator did not translate them back correctly, I don't know. The frustration for us is, and for the IJ is, this is all the IJ has to go on. If it doesn't get corrected at the time, the IJ is not in the position to go and correct it on his own, unless he speaks Cambodian. We don't even have the Cambodian. It wouldn't do me any good, even if I had the Cambodian. And so all we can do is go off of the record here. On redirect, this was all clarified, both on initial direct and on redirect. Did he ever refer someone for political opinions? Hold on. Presumably there's still a tape of the hearing. There should be. Yeah. Page 202. I look again at page, for example, page 182, the government repeats, is this your response, they killed those who opposed the government? Do you remember saying that, sir? Yes. If they really openly opposed the government. And yes, the interviewer asked me that question, yes. He was answering that question. Did he remember saying at the asylum office interview that they did kill those who opposed the government? Yes. That's the basis of his claim. Three-quarters of the way down the same page, page 182, question. But would you send them on to your superiors knowing that they could face severe punishment and even death anyway? Answer, correct. The question before that, well, did it bother you when you were working as a neighborhood supervisor, whatever the job was, to be sending on some of the people from your neighborhood with the possibility that they would be killed? His answer is a hypothetical. For example, if they'd done that, my feeling would be very, very severely depressed. He's interpreting that as a hypothetical question. Did you send them on knowing that they would face severe punishment? When you take it out of the hypothetical, the answer is correct. I believe he's still saying that hypothetically. He's not saying he did. He's saying if that had happened, would he have done that? Yes. Well, the question, would you send them on to your supervisors, I don't know how this gets translated, but a question in ordinary English, would you send them on to your supervisors knowing that they could face severe punishment and even death anyway? Correct. That's not a hypothetical. It's pretty technical reading to see that as a hypothetical. And it does seem to be consistent with things he's testified on on earlier pages. On redirect, he clarified. To change the command, political opponents went through the police. He didn't have anything to do with that. Who was he responsible for, for reeducating, and if they wouldn't cooperate? Which page are you on? I am now on page 201, line 5. I'm sorry, go back one page. Look at 200, line 23. There were people who were forced to work for two or three months. Yes, that's the duty of the militia, of the security people, and they have to send those people through the chain of village, district, and to the city. Line 5 on page 201. For example, one person that wouldn't want to get involved to do the job, and the duty is village leader or district leader, just call the person to have a meeting, give advice, first time, second time, third time only. The punishment of up to three months, that's the duty of the police, yes. Next question, were there ever people in your neighborhood or your district that you reported by name to your superiors that did not come back? We have an objection to the question, that the question's been asked and answered. He answers, anyway, there has been substantial testimony, he said that some people came back, and some did not. My statement after that, I'm trying to clarify whether these were people whose names he personally recorded, and if so, what had been their actions that they did not come back, because I think it got confused. There were people that did not come back, but not people that he referred. He clarified, the political stuff, it goes through the police. The guy they found with the bomb, that went through the police. Now at the top of page 202, this is your question, was there anyone that you reported by name to your superiors that was sent away and never came back? Answer, no. Correct. Next question, were there people who were sent away that did not come back? It looks like it's the same question. Yes, that's the duty of the police. They have the duty to investigate the political opposer, and that's the duty from the village police, district police to the city level. My question was, was there anyone that reported by name to your superiors, someone he was directly involved with, who was sent away and never came back? He says, no, there wasn't. Were there people who were sent away that did not come back? Did that situation happen? Yes. It's the duty of the police. This was the political track that went through the police. Next question, were there any people from your neighborhood or your district that did not come back, and you think that they may have been killed? Just some. The people who under, in my village, under my supervision there. That looks like it's a question, so I'm a little confused there as to whether that's him talking or you talking. Because it's in the transcript that's listed as a cue. That transcriber made a mistake. It looks like it does say Mr. Chung responding to my question. So it looks like it should be an answer.  The people who under, in my village, under my supervision there, the punishment is just very in the medium and is very minor. I don't know what that means. And those minor punishment, they come back and come back to their wives and their kids, they always come back, they're never lost. The punishment is through political opposition. Those punishment is through the police. And whatever involvement they have, I don't know. I don't have the ability to know that. So counsel, you were doing the redirect. What was your, knowing your clients, what testimony you were trying to elicit from your clients, what were you trying to accomplish in this section? I was trying to show that what the previous testimony was confusing and was not clear. Were there people that were killed by the government? Yes. Were there people that disappeared and never came back? Yes. Were people who were politically opposed to the government harmed? Yes. What was his role in that? None. His role was separate. It was minor law breaking. And he, I asked him specifically, what was it that you were responsible for? Whose names did you sometimes have to pass on to your superiors? Cases of domestic violence, refusing to participate in street cleaning, refusing to help guard the village, not reporting overnight visitors. And he was very clear. And opposing the government and refusing to accept reeducation. Opposing the government. And anybody, if you're burglarizing, that could be characterized as opposing the government. Correct. That doesn't appear to be what he said, because he said he was undertaking reeducation efforts. That doesn't sound like rehabilitation of burglars. You're dealing in the context of a communist system and reeducation within a communist system. You try to educate people to think the right way. And political were used in the questions over and over again. And there are places where he's asked to explain what is his understanding of this sort of dissonance. I see that he did have to report wife beaters. Correct. And we did have to report people who were uncooperative and not undertaking their civic duties, such as cleaning the streets. Correct. But he was also asked specifically about political. The question is just what is the IJ supposed to do with the testimony that appears in the record? My position is that the testimony is consistent when you look at it carefully, when you look at it in context, and also when you recognize that there were problems with the translation. Reading this is sometimes hard to understand. Even the interpreters sometimes use broken English, and it's tough. But my position is the evidence does demonstrate either there was no valid inference in the first place that there was persecution of others, or if that inference was there, then Mr. Chung successfully rebutted that inference in his consistent testimony on direct exam and redirect. Was he obliged to send these people on to higher authority? Surely he must have known that if he did that, there could be adverse repercussions to whoever he referred. The people that he referred on, he explained his understanding of the punishment that with those who refused to do street cleaning, they had mandatory work for one to three months. If he tried to talk to them, tried to talk to them, tried to talk to them, they wouldn't cooperate. The superiors tried to talk to them, well, then they were forced to work. With victims of domestic violence, I'm sorry, perpetrators of domestic violence, he testified that there was one man who his wife showed marks, he was forced to report him on, the man was taken to jail, and he heard later that the man had been beaten. But again, as that shouldn't happen, but would that be persecution on account of a political opinion? Refusing to follow the law, saying I'm going to beat my wife if I want to. The evidence is not here that Mr. Chung, there's zero evidence that he directly persecuted anyone or gave permission or witnessed any where he could be deemed to have assisted or participated in persecution on account of a protective characteristic. And my position is the evidence does not show that. Well, the evidence all hangs on his testimony. That's all there is, correct. What he said, how that's interpreted, and how it's applied, correct? Thank you. Good morning, my name is Andrew Burge, I'm the first assistant U.S. attorney from the western district of Michigan here on behalf of the respondent, Attorney General Mukasey. Contrary to my opposing counsel, there is substantial evidence supporting the BIA and immigration judge decisions here. And by that I mean the record does not compel reversal, which is the standard we have. Let me try it a little more conceptually on this, because I find this an odd area of immigration law. The phrase persecution of others is a phrase, persecution is a word of art in immigration law. Why shouldn't we construe that phrase consistently with the way we construe persecution in terms of eligibility? My understanding is that they are construed the same way. For example, this points out, I think this case presents a dilemma we see in these cases. You've argued that what happened to him was not persecution. And yet the evidence that he persecuted others is much more thin. So in fact, even in the government's position in this case, we see there is a dichotomy in the way that the government treats persecution in the context of an asylum application and the word persecution in the context, hold on just a second, you'll get your chance, persecution in the context of this particular exception to eligibility. So now, you're shaking your head and I knew you wanted to jump in, but I wanted to get back to you. Well, I disagree that the evidence for his persecution of others was thin or certainly even thinner than the evidence of him having been persecuted. The only evidence of him having been persecuted related to his own former CPP colleagues telling him, you know, it's a bad idea to leave the CPP, which he knew. But that's not a threat, that's just something he knew. No, it was more personal. I mean, at least we knew what happened. Here there's no, except for his suspicion or belief, I mean, if you credit what the IJ said, he believed that when he referred other people on, that in some cases they were going to suffer. Right, and I can see the immigration judge found here that there's a risk he'll actually be tortured or killed under the cat, but that's a different standard. You can face that risk without ever having been persecuted before. And that's essentially where there's the dichotomy, but that's because the cat is something different than persecution. But here we have strong evidence, there's no better evidence of a person being a persecutor than their own admissions. And that is exactly what Mr. Truong did here. Well, these cases go all over the map, and unfortunately a lot of them are unreported. But for example, I sat on one case in which we had an applicant who was participating in execution squads, but he said he missed, you know, he deliberately fired away from the person every time. Well, of course, that didn't fly. But on the other hand, we had a case out of Peru that's almost just like this, in which someone was an informant for the government, didn't know what happened to any of the people. But he said, yeah, a lot of people were killed. I mean, I have to admit that I suspect that some of the people I turned in were killed. And under our case law, we said, well, that's not enough to show past persecution. So it's hard for me conceptually to fit a lot of these cases, and this is a good example. Well, there is the authority that there's an amount of line drawing that goes on to determine whether or not someone actually did something that amounts to persecution of another, or whether they were personally involved. But here we have Mr. Chung admitting under oath that he told the asylum officer that, yes, people I referred did not come back, and that he knew. This is someone who's in charge of 17,000 people. He is the head of his community. He knows if you're going to get married. He knows if you're going to be beating your wife, or if you have beaten your wife. And he knows that when he sends someone up to his superiors, that they're in danger of being tortured or killed. And it's a reasonable inference from that evidence, and the IJA was reasonable in doing that, to infer that when he sent someone off and they did not come back, that he knew that they had been tortured or killed and physically unable to come back. The best case you have for that in this circuit is the interpreter case, where the interpreter was physically present for the torture, right? And so it's a bit of a leap to go from beyond that interpreter who's physically present to somebody who's referring. Well, the important part of that case and of the law is whether or not the perpetrator's conduct was integral to the ultimate persecution. You can assist in persecuting without having pulled the trigger. And here, Mr. Chong was integral. He's the one who's making the decision of who gets referred on to the superiors and who doesn't. You can't get any more integral than that. Well, are you saying that any referral whatsoever suffices to find him to be a persecutor, or just certain referrals? Well, certainly the referrals where he knows they didn't come back. So you're saying that if somebody's referred, and we draw an inference that somebody who was referred did not return, we don't know whether that person was killed, but you may want to infer that, that that is sufficient to satisfy being a persecutor? Yes, but even if not, keep in mind the context here, which is that the CPP and the country conditions reports confirmed this was a regime where the perpetrator was physically present. So a regime that actually would torture and kill, and Mr. Chong knew that, that was common knowledge. And if you are a person who's being, where the discussion is whether or not you get referred on, that is akin to a threat. Can you imagine the state of mind of someone who is being referred to, about to be referred to, those who have the power to kill or torture? Basically what you're saying is that anyone who's in the position of being a village leader, whatever that world is all about, was going to be deemed to be a persecutor, and their responsibility was to send people to higher authorities if they were unhappy with their behavior. Would you say that that is sufficient to constitute somebody as a persecutor, or do you need something more than that? Well, certainly in the context of this case, that is sufficient, because we have Mr. Chong admitting the context in which he would refer others. And I guess I have to limit myself to what we know about his... Isn't that kind of, you know, disingenuous? Why would somebody, everything depended on his testimony. And you're saying that basically what he said was enough to dam him out of his own mouth. Isn't that a tough proposition? Why would somebody want to do that? Well, that is the difficulty of the nature of this kind of hearing, and the nature of persecution, where the victims, if the issue is what we do with the persecutor, the victims aren't likely to be around to give us evidence. And it goes down to the credibility of Mr. Chong, and that's why the immigration judge took a look at the whole record, to take a look at his cross-examination testimony, took a look at what he said to the asylum officer, and take a look at even the efforts to rehabilitate him on redirection. Well, in that world, he was sort of between a rock and a hard place, or we can use Silius and Cherubis and lots of things that express that. And there's a whole pattern here of a world that I really can't fathom, as much as I try to understand this crazy world of ours in certain places. But this guy left the organization. He was against the Khmer Rouge, and then he got cross-fired with the new administration and back and forth. I just never understand all of that, quite frankly. Try as I may, he's sort of up against it. What is he supposed to do in order to survive himself in that crazy world? Well, his family seems to be doing fine back there for seven years. The IJ found that he couldn't go back without being harmed, but he doesn't have to come here. There's no question. This person, if he goes back there, is going to be tortured. There's a finding. We're bound by that, I take it, right? Yes, at this stage, until the government moves otherwise. Right. So if we find that there is not sufficient evidence to support the IJ's finding, I'm not saying we're going to make that finding or not, but if we were to do that, then there's no need for remand, is there? Well, I believe it does need to go back for the court to decide what to do with his claim for asylum, because that's his discretionary relief, presumably. It could still decide in his discretion for reasons that would have to be addressed at the time. Right. We're talking about eligibility for asylum here, not the ultimate grant, I understand. Right. But how do you deal with Lipetniks, for example? To me, that's the sort of key case. And let me read you two passages out of that case. One passage is, the fact that Lipetniks, and I may be mispronouncing it, but you have to take that on faith, the fact that Lipetniks admitted to investigating all communists by himself does not establish that as a result of these investigations, individuals were persecuted because of political opinion. And then it goes on to say, the record contains no evidence that any individual apprehended by Lipetniks was eventually persecuted because of the person's political beliefs. Without proof of at least one instance in which Lipetniks' investigations resulted in the ultimate persecution of an individual because of his political beliefs, we are unable to infer that such occurred. So under the IJ's view, what happened was he would refer people and they didn't come back. We don't have any evidence that they're talking about in Lipetniks, even under the IJ's view. Is it enough to say, well, we have an inference because they didn't come back that bad things happened to them? Or if you adopt the view of the petitioner, look, I didn't refer anybody, I didn't know of anybody, nobody I referred to got killed as far as I know. Where are we? Well, there's a problem there that you're leaving out, that he has admitted telling the asylum officer that he did know about those he sent off not coming back or being tortured. So we have some admissions here that you didn't have in Lipetniks, you have more than you had in that case. And you also have proof that it was based on politics, because he talked about his job being for him to educate, and that it was his job to educate those who, quote, have politics different from the government, end quote, even on redirect, where he was asked to try to clarify his story. He still said that he would even send rule breakers up to the higher authorities. Now, what we have here is him defining rule breakers in a way where he is conflating what we might call basic criminal law with politics, because he defines dissidents as those who don't respect the laws, and by that he meant those who, quote, create propaganda, end quote, and urge, quote, demonstrations, end quote, against the government, as well as those who do not agree to, quote, help repair the capital, end quote. So he is imputing political motive for any level of violation. While that may seem hard for us to believe or accept, that was the way he viewed it, which is why there was so much trouble when his counsel gets involved to try to separate things out, because in his mind, it's all the same. So we don't have, for example, the dichotomy that she's trying to talk about. She's trying to say there's a logical explanation, but that's not our job here to figure out. Our job is to decide whether or not there was substantial evidence. It was the immigration judge's job to try to sort out where the truth lay, and he had the evidence to do that, based on Mr. Chung's own admissions in the record. So while there are cases that on that spectrum, that line drawing fell short, we have more than that here, because we have admissions to more than what you had there. Further questions? Thank you. Your time has expired, but we'll give you a minute for rebuttal, if you'd like. We took you over time with our questions, so it's only fair to give you a little time to sum up. At bottom, there is not substantial evidence, either to support an adverse credibility finding or to support a finding that Mr. Chung persecuted others for any kind of protected characteristic. The IJ mixed this all up with the K-5 program, which the government has now conceded did not constitute persecution of others. The interpretation was terrible. The asylum office assessment has been demonstrated unreliable, and this is not substantial evidence. I ask that this be remanded, with an order granting Mr. Chung a restriction on removal and withholding of removal under the CAT, and for the board to exercise its discretion to determine whether he merits a credit. Let me ask you this question. If the IJ did conflate or commingle the K-5 scenario with everything else that Justice Barbee questioned you about, would one possible recourse would be to send it back for the IJ to consider this anew, maybe take additional testimony without the K-5 factor being part of his deliberative process? Certainly, Your Honor, because the fact it was conflated confuses what exactly the IJ was doing. The IJ was relying on. Can you give me pages in the record where you think that the IJ conflated this, or in the IJ's own decision? Where I'm finding this is in his oral decision, starting, I believe, at page 63. Hold on just a moment. Page 63, the first full paragraph. The Court finds Respondent is given changing testimony regarding his role in those persons who were killed because they could oppose the government. In this connection, the Respondent also testified that he was one of a group of government officials who decided on the selection of the IJ. The IJ does not affirm on the basis of the IJ's decision. I'm sorry, it does adopt and affirm. However, it also goes on to dispute the questions about translation, because no objections were raised, and it adds this comment on the second page of the board. It says, the Department of Homeland Security has clearly shown evidence of the IJ's decision. There is no evidence indicating that the Respondent, in his position with the government of Cambodia, assisted in the persecution of others, and it cites this to the transcript of pages 105 to 108, which is some of the pages that you and I were discussing previously. It looks like if there was any confusion in the IJ's mind, the BIA has pointed to evidence that did not relate to the K-5 program. But that argument was specifically raised on appeal to the BIA in my brief. There is no evidence that the K-5 program or his involvement constituted persecution of others. He never addressed that. But the evidence that the BIA has specifically said supports the IJ's decision is evidence which clearly is not testimony about the K-5 program. Those pages in the transcript, correct, that was not about the K-5 program, but the board also says that it adopts and affirms the IJ's decision as a whole. It's a Bourbonno Affirmance, right? I'm sorry? It's an Affirmance pursuant to a matter of Bourbonno, which has some implications as to what they're adopting the IJ's rationale as well as their own, right? So it would be kind of a mixed one, yes. Anything further? No, thank you.
judges: Thomas, Bybee, Block